UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

GREEN BAY METROPOLITAN
SEWERAGE DISTRICT,

       Plaintiff,

      v.                                                  Case No. 23-C-451

AXIS SURPLUS INSURANCE COMPANY,

       Defendant.

---

## DECISION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

      This insurance coverage dispute arises out of a settlement agreement entered in an underlying state court action that Plaintiff Green Bay Metropolitan Sewerage District (GBMSD) commenced against Robert E. Lee & Associates, Inc. (REL), in connection with the design and construction of a sewerage pipeline. As part of the settlement of GBMSD's lawsuit against REL and others, REL agreed to the amount of damages allegedly covered by the professional liability policy REL purchased from Defendant AXIS Surplus Insurance Company (AXIS) and assigned GBMSD its rights under that policy. In this action, GBMSD seeks a declaration that it is entitled to recover from AXIS the amount REL agreed upon. By way of its counterclaim, AXIS seeks a declaration that there is no coverage under its policy. The court has jurisdiction under 28 U.S.C. § 1332. The case is before the court on AXIS' motion for summary judgment. For the following reasons, the court will grant the motion and dismiss the case.

## BACKGROUND

GBMSD is a municipal corporation organized under Chapter 200 of the Wisconsin Statutes for the purpose of constructing, owning, operating, and maintaining facilities for the collection and treatment of sewerage in the Green Bay metropolitan area. It owns and operates sewerage lines throughout Brown County and a sewerage treatment plant in Green Bay, Wisconsin. AXIS is an insurance company organized under Illinois law with its principal place of business in the State of Georgia.

In 2010, the Wisconsin Department of Transportation ordered that a major sewerage line in Brown County be relocated to accommodate repairs and expansion of an interstate highway. Pl.'s Resp. to Def.'s Proposed Findings of Fact (PFOF) ¶ 2, Dkt. No. 21. GBMSD, as owner and operator of the sewerage system, entered into a Design Agreement with REL, whereby REL was to design plans for relocation of the sewerage line. *Id.* ¶ 5. In August of 2012, REL completed its design of the relocation project and delivered plans to GBMSD. *Id.* ¶ 8. In accordance with those plans, GBMSD solicited bids for construction of the project. *Id.* On August 24, 2012, GBMSD entered into a written construction contract with PTS Contractors, Inc. (PTS). *Id.* ¶ 9. On August 27, 2012, GBMSD and REL entered into a second agreement, a Professional Services Agreement, whereby REL was to oversee and inspect the work of PTS and its subcontractors during construction. *Id.* ¶ 10. In the spring of 2013, the project was completed. *Id.* ¶ 11. Things soon took a turn for the worse.

On October 30, 2013, a televised inspection of the sewerage line revealed substantial defects in a subsection of sewerage pipe. *Id.* ¶¶ 12–13. A second inspection on March 7, 2014, confirmed the sewerage pipe had several issues: the pipe was "compressed, causing 'ovaling' of some sections . . . , excess pipe deflection, pipe cracking, and a leaking pipe joint." *Id.* ¶¶ 14–15.

In short, "the pipe was not functioning as intended." *Id.* ¶ 15. On March 17, 2014, after learning of the inspection results, REL asked PTS to cure the defects pursuant to PTS' warranty obligations under contract. *Id.* ¶ 16. PTS refused, claiming its work was not deficient. *Id.* ¶ 17. To mitigate risk to its customers, GBMSD took remedial action, costing nearly $5 million. *Id.* ¶¶ 18–19.

On March 27, 2014, GBMSD sent a letter to REL and PTS advising them of potential claims. *Id.* ¶ 28. The letter further advised that GBMSD had retained a third-party consultant, Black & Veatch, to investigate "the cause of the pipe failure, including whether the failure was a result of poor design, improper installation or failure of materials." *Id.* ¶¶ 28–29. Mark Larson, president of REL and the individual responsible for REL's legal affairs and risk management, received GBMSD's letter. *Id.* ¶ 30. Larson notified Arch Insurance Company, which provided claims-made professional liability coverage to REL for the period June 1, 2013, to June 1, 2014, of GBMSD's letter, and Arch issued a reservation letter and appointed defense counsel. *Id.* ¶¶ 30, 57, 59. REL's professional liability coverage under the Arch policy was limited to $2 million per policy period. Larson Dep. at 184, Dkt. No. 28-4.

REL then retained a third-party consultant, GEI, to assess the soil conditions around the defective pipe. Pl.'s Resp. to Def.'s PFOF ¶ 35. On January 13, 2016, GEI notified REL that it observed "several instances where the measured density of the backfill did not meet the Project specification." *Id.* ¶ 36. In layman's terms, the soil around the pipe was too loose and did not provide sufficient support to the sewerage pipe. On October 11, 2016, Black & Veatch concluded in a report that "the sequence of earth loading applied to the casing pipe during construction contributed to the pipe failure." *Id.* ¶ 38 (internal quotation marks omitted). That report was provided to REL on January 31, 2017. *Id.* ¶ 39.

3

On July 30, 2018, in order to provide additional time for further investigation and hoping to avoid litigation over the dispute, GBMSD entered into an agreement with REL, PTS, and EFJ Associates, Inc. (EFJ), an engineering consultant to REL, to toll "all contractual time limitations and notice requirements, statutes of limitation, statutes of repose, limitation periods and notice requirements, and the running of all other time limitation periods and time-based defenses or requirements (contractual or otherwise) relating to the Project." *Id.* ¶ 40 (internal quotation marks omitted). Over a year later, in October of 2019, GBMSD and REL agreed to participate in prelitigation mediation. *Id.* ¶ 46.

In anticipation of the mediation, GBMSD submitted a mediation statement on October 21, 2019, in which it outlined its position. *Id.* ¶ 47. In pertinent part, GBMSD asserted that its investigation had determined two causes of the failure of the pipe. GBMSD claimed that the primary cause of the failure was the design errors by REL and EFJ involving the diameter casing pipe previously identified by Black & Veatch. *See* Larson Dep. at 165. A second cause that contributed to the failure, according to GBMSD, was poor construction techniques by PTS. *Id.* These two causes gave rise to two separate and distinct claims against REL, one under the October 26, 2011 Design Agreement for negligence in connection with the project design, and a second claim under the August 27, 2012 Professional Services Agreement for REL's failure to properly supervise the work performed by PTS. *Id.* GBMSD asserted that because the two claims against REL were based on different contracts and arose at different times, they may trigger policy limits during two different policy periods, resulting in total insurance coverage for REL of $4 million. *Id.* at 166. Notice of the first claim under the Design Agreement was given in early 2014, according to GBMSD. *Id.* at 165. Notice of the second claim, however, came later. GBMSD explained, "The issue regarding the separate claim against REL for negligence in connection with

4

its services during construction first became apparent when GEI's January 2016 written report disclosed negligent construction errors by PTS – and therefore negligent supervision by REL." *Id.* The prelitigation mediation was ultimately unsuccessful.

In the meantime, REL had changed insurers and purchased a policy providing professional liability coverage from AXIS for the period June 1, 2019, to June 1, 2020. Under the policy, AXIS agreed to pay on REL's behalf all damages it was legally obligated to pay as a result of a claim that "was first made against [REL] during the POLICY PERIOD and reported to [AXIS] during the POLICY PERIOD or the EXTENDED CLAIMS Reporting Period, if applicable." Pl.'s Resp. to Def.'s PFOF ¶ 53. REL tendered GBMSD's claim under its Professional Services Agreement to AXIS on December 20, 2019. *Id.* ¶ 61. AXIS rejected REL's tender, claiming there was no coverage for GBMSD's claims against REL under its policy.

On October 25, 2021, GBMSD filed a complaint in Brown County Circuit Court against REL, PTS, and EFJ. *Id.* ¶ 1. As to REL, the complaint asserted breach of contract claims as to both the Design Agreement and Services Agreement, as well as professional liability claims. *Id.* ¶ 20. The parties settled that lawsuit at a second round of mediation in May of 2022 between REL, EFJ, and PTS. *Id.* ¶ 25. Arch also participated in the settlement and made a payment on REL's behalf in the amount of $1,375,000 to GBMSD, but AXIS did not participate. *Id.* ¶ 60. Under the terms of the settlement agreement, "REL agreed that it was liable to GBMSD for an Additional Settlement amount of $2,000,000." *Id.* ¶ 26. REL also assigned any claims it had against AXIS to GBMSD, and GBMSD agreed that it would not attempt to collect the additional $2 million from REL or any of its assets other than the AXIS policy. Larson Dep. at 256–58.

GBMSD commenced this lawsuit as REL's assignee seeking declaratory relief in the form of a determination that AXIS owed REL a duty to indemnify for the $2 million in additional

5

settlement amount that REL owed GBMSD for its failure to properly supervise PTS in its construction of the sewerage pipeline. As REL's assignee and based on the terms of the policy of insurance AXIS issued to REL, GBMSD claims it is entitled to such relief. Based upon the undisputed facts of the case, AXIS now claims in its motion for summary judgment there is no coverage under its policy with REL and it is entitled to judgment of dismissal as a matter of law.

## ANALYSIS

Summary judgment is appropriate when the movant shows there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). AXIS argues it is entitled to summary judgment against GBMSD because the undisputed material facts establish that there is no coverage under its policy for GBMSD's claims against REL. In support of its argument, AXIS contends that its policy, which is governed by New York law, does not provide coverage for three separate and independent reasons: (1) GBMSD's claim was first made prior to the inception of the AXIS policy; (2) GBMSD's damages are covered in whole or in part by the Arch policy; and (3) the Prior Knowledge exclusion in the AXIS policy precludes coverage for REL in connection with GBMSD's claim. GBMSD, in turn, contests each of AXIS' arguments and urges the court to grant summary judgment in its favor under Federal Rule of Civil Procedure 56(f) because, in its view, the undisputed facts establish AXIS is required to indemnify REL. The court will address each argument in order, applying New York law.

When faced with a dispute over insurance coverage, New York courts look first to the language of the policy. *See Sunrise Acupuncture, P.C. v. Kemper Indep. Ins. Co.*, 62 Misc. 3d 307, 86 N.Y.S.3d 710, 712–13 (N.Y. Civ. Ct. 2018). "Principles of contract interpretation apply equally to insurance policies. Thus, in interpreting an insurance policy, the court must determine the rights and obligations of the parties, using the specific language of the policy itself." *Id.*

(internal citations omitted) (citing *Gilbane Bldg. Co./TDX Const. Corp. v. St. Paul Fire & Marine Ins. Co.*, 143 A.D.3d 146, 38 N.Y.S.3d 1, 4 (2016) ("[T]his Court must be guided by the rules of contract interpretation because an insurance policy is a contract between the insurer and the insured.")). "[U]nambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court." *Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 71 N.E.3d 556, 560 (2017). Where an insurance "policy may be reasonably interpreted in two conflicting manners," however, "its terms are ambiguous." *Id.* (quoting another source). "[A]mbiguities in an insurance policy are . . . to be construed against the insurer, particularly when found in an exclusionary clause." *Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 457 N.E.2d 761, 764 (1983). But parties to an insurance contract "cannot create ambiguity from whole cloth where none exists, because provisions 'are not ambiguous merely because the parties interpret them differently.'" *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 25 N.Y.3d 675, 37 N.E.3d 78, 80 (2015) (quoting another source). With these principles in mind, the court now turns to AXIS' first argument.

**A.      GBMSD's Claim Was First Made Prior to the Inception of the AXIS Policy**

The AXIS policy is a claims-made policy. It provides professional liability coverage for a "Claim" that is first made against REL during the policy period of June 1, 2019, to June 1, 2020. "Claim" is defined in the policy as "any demand received by YOU alleging liability or responsibility on YOUR part for DAMAGES arising from PROFESSIONAL SERVICES." AXIS Policy at 51, Dkt. No. 1-1. This definition has been held unambiguous and will therefore be given its plain meaning. *See Quanta Lines Ins. Co. v. Invs. Cap. Corp.*, No. 06 CIV. 4624 (PKL), 2009

7

WL 4884096, at *11–12 (S.D.N.Y. Dec. 17, 2009), *aff'd sub nom. Quanta Specialty Lines Ins. Co. v. Invs. Cap. Corp.*, 403 F. App'x 530 (2d Cir. 2010).

GBMSD argues that it had two distinct claims against REL: (1) a *design* claim and (2) a *construction oversight* claim. GBMSD concedes that the design claim was first made prior to the policy period in the March 27, 2014 letter and, thus, there is no coverage under the AXIS policy. GBMSD argues, however, that the construction oversight claim was not asserted until the October 21, 2019 mediation statement. Because the construction oversight claim is separate from and is based on a different contract than the design claim and was made during the period when AXIS' policy was in effect, GBMSD argues it is covered by AXIS' policy.

AXIS disputes GBMSD's contention that it made two separate claims against REL. It argues that GBMSD's claim against REL was made in GBMSD's March 27, 2014 letter, when GBMSD notified REL and PTS that the video evidence produced by its consultant had disclosed several defects and a failure in the pipeline designed by REL and constructed by PTS. GBMSD stated in its letter that it had retained Black & Veatch to assist in its investigation to determine whether the failure was the result of poor design, improper installation, or failure of materials and asked that "both PTS and REL put their respective insurers and sureties, as well as the relevant material suppliers and/or subcontractors, on notice of the potential claims discussed in this letter." March 27, 2014 Letter at 2, Dkt. No. 23-2. Because REL's professional services on the project consisted of both design and construction supervision, AXIS argues that REL's construction services in supervising PTS's installation of the pipeline was part of the claim from the beginning.

But even assuming there are two distinct claims, the policy's "multiple claims" provision precludes coverage. That provision provides:

> One or more CLAIMS arising out of a single WRONGFUL ACT or out of a series
> of related WRONGFUL ACTS shall be treated as a single CLAIM, and shall be

8

> subject to the Each CLAIM Limit of Liability and only one Deductible. All such CLAIMS, whenever made, shall be considered first made on the date on which the earliest CLAIM was first made.

AXIS Policy at 54. A "Wrongful Act" is "any act, error or omission committed by [REL] in the performance of [its] PROFESSIONAL SERVICES." *Id.* at 52. And "Professional Services" are "those architectural, engineering, consulting, project management, or construction management services" that REL performed "for others for a fee." *Id.* Based on these definitions, the parties do not dispute that REL committed a wrongful act in performance of its design professional services and its construction oversight professional services. Rather, the question is whether these wrongful acts were "related" such that they "shall be treated as a single CLAIM."

New York courts apply the "sufficient factual nexus" test to determine whether a "prior claim is interrelated with a subsequent claim." *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *14 (considering nearly identical language and collecting cases); *Alvarez v. XL Specialty Ins. Co.*, 202 A.D.3d 566, 159 N.Y.S.3d 681, 681 (2022) (adopting the sufficient factual nexus test laid out in *Quanta Lines*). "A sufficient factual nexus exists where the Claims 'are neither factually nor legally distinct, but instead arise from common facts' and where the 'logically connected facts and circumstances demonstrate a factual nexus' among the claims." *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *14 (quoting *Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02 CIV. 10088 (PKL), 2004 WL 1145830, at *9 (S.D.N.Y. May 21, 2004), *aff'd*, 133 F. App'x 770 (2d Cir. 2005)). A sufficient factual nexus does not require "precisely the same parties, legal theories, Wrongful Acts, or requests for relief." *Zunenshine v. Exec. Risk Indem., Inc.*, No. 97 Civ. 5525, 1998 WL 483475, at *5 (S.D.N.Y. Aug. 17, 1998) (cleaned up). Rather, courts have found that a sufficient factual nexus exists where "the two claims had specific overlapping facts," *Glascoff v. OneBeacon Midwest Ins. Co.*, No. 13 CIV. 1013 DAB, 2014 WL 1876984, at *6 (S.D.N.Y. May 8, 2014)

9

(collecting cases), or where a subsequent claim is an "outgrowth" of a prior claim, *see Hunt Constr. Grp., Inc. v. Berkley Assurance Co.*, 503 F. Supp. 3d 106, 113 (S.D.N.Y. 2020), *aff'd*, No. 21-2532-CV, 2022 WL 17825813 (2d Cir. Dec. 21, 2022).

Here, the design claim and the construction oversight claim share a sufficient factual nexus such that they shall be considered one claim. Both claims involve the same parties—GBMSD, REL, and PTS. Both claims center around the same transaction—the sewerage pipe relocation project. Both claims request the same relief—remediation for the sewerage pipe failure. It is not dispositive that the wrongful act at issue in each claim contemplates a different form of professional service, nor that the contract giving rise to each claim differed. Placed on top of one another, the two claims have substantial factual overlap. *See Zahler v. Twin City Fire Ins. Co.*, No. 04 CIV. 10299 (LAP), 2006 WL 846352, at *6–7 (S.D.N.Y. Mar. 31, 2006); *cf. Glascoff*, 2014 WL 1876984, at *6–7 (holding that two claims did not share a sufficient factual nexus because, although the two claims alleged the same general theory of wrongdoing, the claims concerned different specific facts, legal theories, requests for relief, and parties). To hold otherwise "would be to grant the insured more coverage than [it] bargained for and paid for, and to require the insurer to provide coverage for risks not assumed." *Zuneshine*, 1998 WL 483475, at *5.

Because the two claims arise out of a series of related wrongful acts, they are treated as a single claim and are considered made on the date on which the first claim was made. It is undisputed that the first claim was made in early 2014, more than five years before the effective date of AXIS' policy. It thus follows that neither claim is covered by AXIS. For this reason alone, AXIS is entitled to summary judgment.

10

Case 1:23-cv-00451-WCG   Filed 01/23/25   Page 10 of 16   Document 27

## B. Arch Policy Applies and Precludes Coverage

AXIS next argues that its policy does not cover GBMSD's claim against REL because the claims or damages alleged in the underlying state court lawsuit were partially covered by a policy in force prior to the AXIS policy. REL was insured by Arch Insurance Company for the effective period June 1, 2013, to June 1, 2014. Pl.'s Resp. to Def.'s PFOF ¶ 57. On April 14, 2014, REL tendered its design claim to Arch, and Arch subsequently participated in the May 2022 settlement, ultimately paying GBMSD $1,375,000 on REL's behalf. *Id.* ¶¶ 58, 60. AXIS argues that Arch's payment triggers the "other insurance/no liability" clause of its policy. That provision states, "this insurance does not apply to CLAIMS, CLAIMS EXPENSES, or DAMAGES covered, in whole or in part, under any valid insurance policy in force prior to this policy." AXIS Policy at 50–51. Because GBMSD's claim against REL was covered in whole or part under the policy issued by Arch, AXIS argues coverage does not exist under its policy.

GBMSD argues in response that the "other insurance/no liability" clause should not be given effect because it conflicts with the policy's "other insurance" condition. The "other insurance" condition has two provisions. The first applies where the other insurance is excess insurance. It provides that AXIS' liability under its policy is not reduced by the existence of excess insurance. AXIS Policy at 59. Since the insurance under the Arch policy was not excess insurance, this provision does not apply and is not inconsistent with the "other insurance/no liability" clause of AXIS' policy.

The second provision of the "other insurance" condition is likewise inapplicable here. It states:

> When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess, or contingent, WE shall not be liable under this policy for a greater proportion of the loss than that stated in the Declarations or the following contribution provision; whichever is lower:

11

> a. Contribution by Equal Shares - If all of such other valid and collectible insurance provides for contribution by equal shares, WE will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.
>
> b. Contribution by Limits - If any of the other insurance does not permit contribution by equal shares, WE will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

*Id.* GBMSD argues that because the "other insurance" clause contemplates sharing liability with insurance provided under another policy, it conflicts with the "other insurance/no liability" provision of the policy. Under New York law, insurance policy provisions that reduce coverage and conflict with other provisions of a policy are not given effect. *Utica Mut. Ins. Co. v. Travelers Ins. Co.*, 213 A.D.2d 983, 624 N.Y.S. 2d 485, 487 (1995); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Travelers Indem. Co.*, 210 F. Supp. 2d 479, 489–90 (S.D.N.Y. 2002). It thus follows, GBMSD argues, that the "other insurance/no liability" provision of AXIS' policy should not be given effect.

GBMSD's argument fails, however, because the two provisions do not conflict. The "other insurance/no liability" clause only applies when the "CLAIMS, CLAIMS EXPENSES, or DAMAGES [are] covered, in whole or in part, under any valid insurance policy *in force prior to this policy*." AXIS Policy at 50–51 (emphasis added). It is only when the other insurance is in force at the same time that the policy's "other insurance" provision requiring shared liability applies. Since there is no dispute that the Arch policy was "in force prior to this [AXIS] policy" and that Arch paid at least part of the damages claimed by GBMSD, it follows that the "other insurance/no liability" provision applies. For this reason, as well, AXIS is entitled to summary judgment.

12

## C. Prior Knowledge Exclusion Precludes Coverage

Finally, AXIS argues that coverage for GBMSD's claim is excluded by the policy's "Prior Knowledge" exclusion. Because AXIS seeks to invoke an exclusion to disclaim coverage, it has the burden to show that the "exclusion is stated in clear and unmistakable language, . . . and applies in th[is] particular case." *Cont'l Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 609 N.E.2d 506, 512 (1993); *see also Liberty Ins. Underwriters, Inc. v. Corpina Piergrossi Overzat & Klar LLP*, 78 A.D.3d 602, 604, 913 N.Y.S.2d 31 (2010). At summary judgment, AXIS must show the exclusion applies where all facts are viewed and all reasonable inferences are granted in the light most favorable to GBMSD. *See Stout v. 1 E. 66th St. Corp.*, 90 A.D.3d 898, 906, 935 N.Y.S.2d 49 (2011).

Here, the parties do not dispute that the Prior Knowledge exclusion is unambiguous. The exclusion provides,

> This insurance does not apply to CLAIMS, CLAIMS EXPENSES, or DAMAGES based upon or arising out of . . . an actual or alleged WRONGFUL ACT with respect to PROFESSIONAL SERVICES which occurred prior to the inception date of the policy known to any INSURED'S principal, partner, director, officer, agent or employee with responsibility for environmental affairs, legal affairs or risk management and which could reasonably be expected to give rise to a CLAIM.

AXIS Policy at 52–53. The parties also do not dispute that New York courts applying Prior Knowledge exclusions use the two-prong, mixed subjective/objective test outlined in *Liberty Ins. Underwriters, Inc.*, 78 A.D.3d 602. The first prong is subjective and asks whether the insured had "knowledge of the relevant facts prior to the policy's effective date." *Id.* at 604–05. The second prong is objective and asks whether, based on the facts known to the insured, a reasonable person "might expect such facts to be the basis of a claim." *Id.* (quoting another source).

Thus, the court must first establish what facts REL knew prior to June 1, 2019. First, Mark Larson, REL's president, knew about the March 27, 2014 letter sent by GBMSD to REL. In that

13

letter, Larson, if he did not know already, was advised that inspection of the sewerage pipe disclosed several defects and failures. Specifically, the letter indicated GBMSD had retained a consultant to investigate "whether the failure was a result of poor design, improper installation or failure of materials." March 27, 2014 Letter at 2. The letter continued, advising PTS that it may be responsible for replacing the pipe under the warranty provisions of its contract with GBMSD, and noticing REL of a potential claim as the "pipe failure may have been caused by negligent design." *Id.* The letter concluded by requesting that REL and PTS assist in determining the cause of the pipe failure by preserving "all documents concerning construction of the project." *Id.*

Second, on January 13, 2016, Larson received the report of its own expert, GEI, which concluded that loose backfill materials provided insufficient support to the sewerage pipe, causing deflections, ovaling, and ultimately, failure. *See* GEI Report at 7–8, Dkt. No. 7-2. On October 11, 2016, Larson also received Black & Veatch's report which concluded that the sequence of earth loading on the sewerage pipe, from installation and backfill to placing of the new highway embankments, caused the pipe's failure. Black & Veatch Report at 11, Dkt. No. 7-3. Finally, Larson read and signed the July 30, 2018 Tolling Agreement. In the agreement's recitals, it is noted that GBMSD entered into contracts for design and construction services with REL, and that "GBMSD claims that several defects and failures exist in design and construction." Tolling Agreement at 2, Dkt. No. 7-4.

GBMSD argues that Larson did not "*actually know* of an actual or alleged act, error or omission *committed by REL* in the performance of its construction oversight services." Pl.'s Br. in Opp. at 23, Dkt. No. 24. But this framing misunderstands the subjective prong. The subjective prong only requires that Larson subjectively knew of the facts underlying the eventual claim, not that Larson subjectively believed the eventual claim was likely. *N. River Ins. Co. v. Leifer*, No.

14

21-CV-7775, 2022 WL 1210847, at *2 (S.D.N.Y. Apr. 25, 2022), *aff'd*, No. 22-1009, 2023 WL 2978970 (2d Cir. Apr. 18, 2023); *Pine Mgmt., Inc. v. Colony Ins. Co.*, No. 1:22-CV-02407 (MKV), 2023 WL 2575082, at *4 (S.D.N.Y. Mar. 20, 2023), *aff'd*, No. 23-624-CV, 2024 WL 1266244 (2d Cir. Mar. 26, 2024); *see also B Five Studio LLP v. Great Am. Ins. Co.*, 414 F. Supp. 3d 337, 340 (E.D.N.Y. 2019). Thus, GBMSD's argument that REL did not expect or divine a construction oversight claim is unavailing. It is undisputed that Larson knew of the March 27, 2014 letter, the GEI and Black & Veatch reports, and the Tolling Agreement. Larson certainly knew of REL's duties under both of its contracts with GBMSD. So, the subjective prong is satisfied.

GBMSD's argument seems to align with the second prong more neatly, but the second prong is objective not subjective. There, the inquiry is whether a reasonable person "might expect" the facts known to Larson "to be the basis of a claim." *Liberty Ins. Underwriters, Inc.*, 78 A.D.3d at 605. Under this prong, Larson's "subjective belief that a claim would not be brought is irrelevant." *N. River Ins. Co.*, 2022 WL 1210847, at *3 (internal quotation marks omitted and quoting another source).

Here, a reasonable person might have expected the facts as known to Larson to form the basis of a construction oversight claim. First, the March 27, 2014 letter, while only explicitly noticing a design claim, also indicates the cause of the pipe failure might have been improper installation. REL and PTS were also asked to retain all documents relating to both design and construction. Second, and most dispositive, the report by GEI concluded that the pipe failure was due in part to improper backfill—an element of construction. The Black & Veatch report confirmed GEI's finding and also verified there were design defects in the project. Finally, the Tolling Agreement maintained that several claims were at play, relating to both design and construction. A reasonable person responsible for oversight and inspection of construction

15

services would have foreseen or reasonably expected that a construction oversight claim might arise from the foregoing facts. *N. River Ins. Co.*, 2022 WL 1210847, at *4; *ChemTreat, Inc. v. Certain Underwriters at Lloyd's of London*, 488 F. Supp. 3d 343, 359 (E.D. Va. 2020) (applying New York law). Indeed, GBMSD acknowledged as much in its October 2019 mediation statement wherein it noted that "[t]he issue regarding the separate claim against REL for negligence in connection with its services during construction first became apparent when GEI's January 2016 written report disclosed negligent construction errors by PTS – and therefore negligent supervision by REL." Larson Dep. at 165.

In sum, AXIS has shown that an alleged error in construction oversight services occurred before June 1, 2019, and REL—through Larson—could have reasonably expected that error to give rise to a claim. Therefore, the Prior Knowledge exclusion precludes coverage and AXIS is entitled to summary judgment.

## CONCLUSION

For these reasons, Defendant AXIS' motion for summary judgment (Dkt. No. 18) is **GRANTED**. The Clerk is directed to enter judgment declaring that AXIS Surplus Insurance Company owes no duty to indemnify Robert E. Lee & Associates, Inc. under policy number EMP19001953-01 for the additional settlement amount agreed to in *Green Bay Metropolitan Sewerage District v. Robert E. Lee & Associates, Inc.*, Case No. 2021-CV-1181 (Brown Cnty., Wis.), and dismissing GBMSD's claim against AXIS.

**SO ORDERED** at Green Bay, Wisconsin this 22nd day of January, 2025.

s/ William C. Griesbach
William C. Griesbach
United States District Judge